J-A17039-14

2014 PA Super 282

| | |
|---|---|
| JAMES C. MARKOVSKY, EXECUTOR OF THE ESTATE OF JAMES MARKOVSKY, DECEASED <br><br> Appellant <br><br> v. <br><br> CROWN CORK & SEAL CO., PENN CENTRAL CORPORATION AND CONSOLIDATED RAIL CORPORATION <br><br> Appellee | IN THE SUPERIOR COURT OF PENNSYLVANIA <br><br><br><br><br><br><br><br><br><br> No. 2755 EDA 2013 |

Appeal from the Order of September 11, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No: 0451

BEFORE:  GANTMAN, P.J., PANELLA, and STABILE, JJ.

OPINION BY STABILE, J.:                    **FILED DECEMBER 22, 2014**

Appellant James C. Markovsky, Executor of the Estate of James Markovsky, deceased, appeals from the September 11, 2013 order of the Court of Common Pleas of Philadelphia County, which granted summary judgment in favor of Appellee Crown Cork & Seal Co.[1]  For the reasons set forth below, we affirm.

---

[1] By *per curiam* order dated November 22, 2012, we granted Appellant's petition to discontinue this appeal as to Appellees American Premier Underwriters, a/k/a Penn Central Corporation, and Consolidated Rail Corporation.

## I. BACKGROUND

On October 6, 2011, Appellant James Markovsky, now deceased, filed a complaint against, *inter alia*, Appellee alleging he contracted mesothelioma "caused by exposure to the asbestos products of Mundet," Appellee's predecessor-in-interest. Complaint, 10/06/11, at ¶¶ 10ad, 13. Specifically, Appellant alleged "he was exposed to asbestos fiber or asbestos products manufactured, sold, distributed, or otherwise placed into the stream of commerce by [Appellee]." *Id.* at ¶ 11.

On June 25, 2013, Appellee moved for summary judgment against Appellant on the basis of, *inter alia*, 15 Pa.C.S.A. § 1929.1 (Section 1929.1), Act of December 17, 2001, P.L. 904, No. 101 (Act 101 of 2001 or Act 101), which in part provides:

**(a) Limitation on successor asbestos-related liabilities.--**

(1) Except as further limited in paragraph (2), the cumulative successor asbestos-related liabilities of a domestic business corporation that was incorporated in this Commonwealth prior to May 1, 2001, shall be limited to the fair market value of the total assets of the transferor determined as of the time of the merger or consolidation, and such corporation shall have no responsibility for successor asbestos-related liabilities in excess of such limitation.

(2) If the transferor had assumed or incurred successor asbestos-related liabilities in connection with a prior merger or consolidation with a prior transferor, then the fair market value of the total assets of the prior transferor, determined as of the time of such earlier merger or consolidation, shall be substituted for the limitation set forth in paragraph (1) for purposes of determining the limitation of liability of a domestic business corporation.

 . . . .

- 2 -

**(d) Application.--**

(1) The limitations set forth in subsections (a) and (b) shall apply to mergers or consolidations effected under the laws of this Commonwealth or another jurisdiction consummated prior to May 1, 2001.

(2) The limitations set forth in subsections (a) and (b) shall apply to all asbestos claims, including existing asbestos claims, and all litigation, including existing litigation, and shall apply to successors of a domestic business corporation to which this section applies.

(3) The limitations set forth in subsections (a) and (b) shall not apply to workers' compensation benefits paid by or on behalf of an employer to an employee pursuant to the act of June 2, 1915 (P.L. 736, No. 338), known as the Workers' Compensation Act, or comparable workers' compensation law of another jurisdiction.

(4) The limitations set forth in subsections (a) and (b) shall not apply to any claim against a domestic business corporation that does not constitute a successor asbestos-related liability.

(5) This section shall not apply to an insurance corporation as defined in section 3102 (relating to definitions).

(6) The limitations set forth in subsections (a) and (b) shall not apply to any obligations arising under the National Labor Relations Act (49 Stat. 449, 29 U.S.C. § 151 et seq.) or under any collective bargaining agreement.

**(e) Definitions.--**As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

 . . . .

"Successor asbestos-related liabilities." Any liabilities, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated or due or to become due, related in any way to asbestos claims, that were assumed or incurred by a domestic business corporation or foreign business corporation as a result of or in connection with a merger or consolidation, or the plan of merger or consolidation related thereto, with or into another domestic business corporation or foreign business corporation effected under the laws of this Commonwealth or another jurisdiction or which are related in any way to asbestos claims based on the exercise of control or the ownership of stock of such corporation prior to such merger or consolidation. The term shall also include liabilities which, after the time of the merger or consolidation as to which the fair market value of total assets is determined for purposes of subsections (a) and (b), were or are paid or otherwise discharged, or committed to be paid or otherwise discharged, by or on behalf of the corporation, or by or on behalf of a transferor, in connection with settlements, judgments or other discharges in this Commonwealth or another jurisdiction.

"Transferor." A domestic business corporation or foreign business corporation from which successor asbestos-related liabilities are assumed or incurred.

15 Pa.C.S.A. § 1929.1(a),(d) and (e).

In **Johnson v. Am. Standard**, 966 A.2d 573 (Pa. Super. 2009), in explaining the purpose of Section 1929.1, this Court remarked:

[Section 1929.1] limits the asbestos-related liability of Pennsylvania corporations when that liability arises from a merger or consolidation. In general, [Section 1929.1] caps the successor corporation's asbestos-related liability at the fair market value of the prior company as of the time of the merger or consolidation. . . .

**Id.** at 576 (cited only for background purposes), **rev'd on other grounds**, 8 A.3d 318 (Pa. 2010).

On July 12, 2013, Appellant filed a response to Appellee's summary judgment motion. In its response, Appellant argued, *inter alia*, that Section 1929.1 was unconstitutional because it violated Article III, Section 32 of the Pennsylvania Constitution, the dormant Commerce Clause under the United States Constitution, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[2] Additionally, Appellant argued the manner in which legislation containing Section 1929.1 was enacted was constitutionally flawed. Specifically, Appellant challenged the legislation on the basis of Article III, Sections 1 (original purpose) and 3 (single subject) of the Pennsylvania Constitution.

_____

[2] In **Johnson v. Am. Standard**, 8 A.3d 318 (Pa. 2010), the Supreme Court held individual plaintiffs had standing to challenge Section 1929.1 on the basis of the Equal Protection and dormant Commerce Clauses. **Id.** at 333-34.

On July 17, 2013, Appellee filed a reply to Appellant's response to the summary judgment motion, specifically contesting Appellant's constitutional arguments. On September 11, 2013, the trial court issued an order granting Appellee's summary judgment motion as a matter of law. Appellant filed a timely appeal to this Court. Although the trial court did not order Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, it issued an opinion on January 8, 2014 in support of its order granting Appellee's summary judgment motion. In its opinion, the trial court dismissed Appellant's constitutional arguments as unpersuasive.[3] Before addressing the constitutional arguments, however, the trial court noted it granted summary judgment in favor of Appellee on the basis that Appellee was protected from liability under Section 1929.1. Specifically, the trial court found "[Appellant] acknowledges [Section 1929.1], on its face, would bar [its] claims against [Appellee]. There is no dispute [Appellee] has paid hundreds of millions of dollars on asbestos claims pertaining to Mundet products, and there is no dispute this amount far exceeds Mundet's value at the time it merged into [Appellee]." Trial Court Opinion, 1/8/14, at 2.

---

[3] The trial court, in part, relied on Judge Alan Tereshko's ruling in a prior asbestos-related case to dismiss Appellant's constitutional arguments. Trial Court Opinion, 1/8/14 at 3-4. Specifically, the trial court relied upon *In re Asbestos Litig.*, 59 Pa. D. & C. 4th 62, 2002 WL 130599 (Phila. Com. Pl. 2002), *rev'd and remanded on other grounds sub nom.*, *Ieropoli v. AC&S Corp.*, 842 A.2d 919 (Pa. 2004).

Addressing Appellant's dormant Commerce Clause argument, the trial court concluded that Appellant "has failed to show [Section 1929.1] violates the dormant aspect of the United States Constitution's Commerce Clause." *Id.* at 4. The trial court further concluded "there is no apparent discrimination against interstate commerce. [Section 1929.1] merely protects Pennsylvania corporations from excessive liabilities. There is no indication this will encourage intrastate rather than interstate commerce." *Id.* at 6.

The trial court next addressed Appellant's argument under the Fourteenth Amendment to the United Stated Constitution. Relying upon legislative history, the trial court found:

> [Section 1929.1] was meant to advance the Commonwealth's basic governmental interest to make sure our corporate merger laws do not unfairly expose innocent companies to ruin solely because of a merger. [Section 1929.1] combats the unprecedented avalanche of asbestos-related claims threatening to destroy corporations like Crown [(Appellee)], which are exposed to liability based solely on their predecessors' actions. [Section 1929.1] protects such corporations, which provide jobs to Pennsylvania residents and are integral to the Commonwealth's economy. [Section 1929.1] only affects plaintiffs' tort recoveries to the extent necessary to protect corporations exposed to excessive successor liabilities, noting the asbestos plaintiffs would still be adequately compensated by the plethora of other defendants.

*Id.* at 7-8 (internal citation and quotation marks omitted). The trial court thus concluded that "[Section 1929.1] is rationally related to a legitimate purpose." *Id.* at 8.

- 6 -

Addressing Appellant's contention that Section 1929.1 violated Article III, Section 32 of the Pennsylvania Constitution by creating a one-member class, the trial court found:

> [Appellant] has not established the [s]tatute was intended to benefit [Appellee] alone. The [s]tatute's legislative history reflects its sponsors used [Appellee] as an example of the [s]tatute's purpose, all the while emphasizing the potential benefit to other similarly situated corporations throughout the Commonwealth.
>
> More importantly, [Appellant] has not shown it is impossible or highly unlikely for other corporations to enjoy the [s]tatute's protections.

*Id.* at 10 (internal record citations omitted). Accordingly, the trial court concluded that the statute was not unconstitutional under Article III, Section 32.

The trial court lastly addressed Appellant's challenge to the propriety of the underlying legislation giving rise to Section 1929.1. Specifically, the trial court addressed Appellant's challenge to the legislation, *i.e.*, Act 101 of 2001, under Article III, Sections 1 (original purpose) and 3 (single subject) of the Pennsylvania Constitution. With respect to Article III, Section 1, the trial court found that the Act 101's original purpose was "the regulation of asbestos-related liability." *Id.* at 12. In so finding, the trial court disagreed with Appellant's contention that Act 101's original purpose had to be construed narrowly. *Id.* at 11-12. Based on this finding, the trial court concluded the legislation did not violate the constitution, because the legislation's "purpose remained intact when [it] was altered to limit successor liability and provide for certain judicial costs." *Id.* at 12.

Regarding the constitutionality of the legislation under Section 3 of Article III, the trial court found that the legislation's "single subject is the same as its original purpose, the regulation of asbestos-related liability." *Id.* In so doing, the trial court rejected Appellant's argument that Act 101's limitations and successor liability were separate subjects. *Id.* The trial court thus concluded that the legislation was not violative of Article III, Section 3, because its "provisions pertaining to the statute of limitations and successor liability in asbestos cases are not distinct or independent. Rather, those provisions deal with sub-topics germane to regulating asbestos-related liability." *Id.*

## II. DISCUSSION

On appeal,[4] challenging the trial court's grant of summary judgment in favor of Appellee, Appellant raises five issues for our review.[5]

_____

[4] It is well-settled that

> [o]ur scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

> Summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment.

*Hovis v. Sunoco, Inc.*, 64 A.3d 1078, 1081 (Pa. Super. 2013) (quoting *Cassel-Hess v. Hoffer*, 44 A.3d 80, 84-85 (Pa. Super. 2012)). "Failure of a non-moving party to adduce sufficient evidence on an issue essential to his

*(Footnote Continued Next Page)*

I.  Did the lower court err when it refused to rule that [] 15 Pa.C.S.[A.] § 1929.1[] created a one-member, closed class in violation of Article III, § 32 of the Pennsylvania Constitution?

II.  Did the lower court err when it refused to rule that [] 15 Pa.C.S.A. § 1929.1 violated Article III, § 1, the "original purpose" provision of the Pennsylvania Constitution?

III.  Did the lower court err when it refused to rule that [] 15 Pa.C.S.A. § 1929.1 violated of [sic] Article III, § 3, "single subject" provision of the Pennsylvania Constitution?

IV.  Did the lower court err when it refused to rule that[] 15 Pa.C.S.A. § 1929.1 violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution?

V.  Did the lower court correctly rule that there was a genuine issue of material fact as to Mr. Markovsky's exposure on a regular and frequent basis for decades to asbestos from products manufactured by [Appellee's] predecessor-in-interest, Mundet Cork Company?

Appellant's Brief at 4-5.[6]

_(Footnote Continued)_ _____

case and on which it bears the burden of proof . . . establishes the entitlement of the moving party to judgment as a matter of law." **_Young v. PennDOT_**, 744 A.2d 1276, 1277 (Pa. 2000) (noting that under Pa.R.C.P. No. 1035.2, grant of summary judgment is proper when "an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the causes of action . . . which in a jury trial would require the issues to be submitted to a jury").

[5] Appellant has not raised its dormant Commerce Clause claim in this appeal, because it does not raise it as a question presented for review in its brief. As Appellee notes, Appellant mentions the dormant Commerce Clause argument _only_ in a footnote in its brief and otherwise fails to develop the argument in any meaningful way. We agree. **_See_** Pa.R.A.P. 2116(a) ("The statement of the questions involved must state concisely the issues to be resolved"); **_see also Southcentral Emp't Corp. v. Birmingham Fire Ins. Co. of Pa._**, 926 A.2d 977, 983 n.5 (Pa. Super. 2007) (holding that issue not explicitly raised in appellant's statement of the questions involved is waived); **_see also_** Pa.R.A.P. 2119(a), (b) (relating to the requirements of the argument section); **_see also J.J. DeLuca Co., Inc. v. Toll Naval Assocs._**, 56 A.3d 402, 412 (Pa. Super. 2012) (concluding that an issue is waived when appellant failed to develop legal argument or cite relevant legal authority in support of that issue). Thus, to the extent Appellant mentions a dormant Commerce Clause argument, it is in passing only and within the context of its argument that Section 1929.1 violates Article III, Section 32 and the Equal Protection Clause of the United States Constitution.

[6] For ease of discussion, we have reorderd Appellant's issues. We also have removed the references to "the Crown Cork Statute" from the issues as

_(Footnote Continued Next Page)_

At the outset, we note:

> acts passed by the General Assembly are strongly presumed to be constitutional, including the manner in which they were passed. Accordingly, a statute will not be declared unconstitutional unless it clearly, palpably, and plainly violates the Constitution. If there is any doubt that a challenger has failed to reach this high burden, then that doubt must be resolved in favor of finding the statute constitutional.

**Pa. State Ass'n of Jury Comm'rs v. Commonwealth**, 64 A.3d 611, 618 (Pa. 2013) (internal citation and quotation marks omitted). The constitutional validity of a statute presents a pure question of law and, as with any question of law, our review of the trial court's decision is plenary and *de novo.* **See West Mifflin Area Sch. Dist. v. Zahorchak**, 4 A.3d 1042, 1048 (Pa. 2010).

### A. Special Law

We first address Appellant's argument that the trial court erred in granting Appellee's summary judgment motion, because Section 1929.1 was violative of Article III, Section 32 of the Pennsylvania Constitution to the extent Section 1929.1 created a one-member, closed class consisting solely

---

*(Footnote Continued)* ————————

presented in Appellant's brief. The section of the statute in question is titled, "Limitations on asbestos-related liabilities relating to certain mergers or consolidations." Although our review of case law reveals two occasions on which now-retired Judge Richard J. Klein of this Court referred to the statute as "the Crown Cork Statute," neither our Supreme Court nor this Court, in any majority opinion, has elected to do so and we shall not do so in this Opinion. **See Vanaman v. DAP, Inc.**, 966 A.2d 603 (Pa. Super. 2009) (*en banc*) (Klein, J., concurring and dissenting) and **Burger v. Owens Illinois, Inc.**, 966 A.2d 611 (Pa. Super. 2009) (*en banc*) (Klein, J., concurring and dissenting).

of Appellee. In support of his argument, Appellant points out that Section 1929.1 creates a substantially closed class, because it sanctions membership into the class only when the following seven requirements have been fulfilled:

> 1. The business must be a corporation. 15 Pa.C.S. § 1929.1 (a)(1).
>
> 2. The corporation must be a Pennsylvania corporation. 15 Pa.C.S. § 1929.1(a)(1).
>
> 3. The corporation must have been incorporated before May 1, 2001. 15 Pa.C.S. § 1929.1(a)(1).
>
> 4. The corporation must have been involved in a merger or acquisition of a second corporation prior to May 1, 2001. 15 Pa.C.S. § 1929.1(d)(1).
>
> 5. The second corporation must have incurred asbestos-related liabilities prior to the merger or acquisition. 15 Pa.C.S. § 1929.1(a)(2).
>
> 6. The first corporation must have assumed, knowingly or unknowingly, the asbestos-related liabilities of the second corporation. 15 Pa.C.S. § 1929.1(a)(2).
>
> 7. Neither the first nor the second corporation can be an insurance company. 15 Pa.C.S. § 1929.1(d)(5).

Appellant's Brief at 16. Appellant argues that the foregoing classifications were designed by the legislature for the exclusive benefit of Appellee and that no other company could meet the classifications. *Id.* at 20. Relying upon *West Mifflin*, Appellant contends that Section 1929.1 is *per se* unconstitutional, because it creates a one-member class that is either closed or substantially closed. *Id.* at 17-20. We disagree.

Article III, Section 32 provides in pertinent part that "[t]he General Assembly shall pass no local or special law in any case which has been or can be provided for by general law[.]" PA. CONST. art. III, § 32.

It is well-settled that "a statute may be deemed *per se* unconstitutional if, under the classification, the class consists of one member and is closed or substantially closed to future membership. ***See Pa. Tpk. Comm'n v. Commonwealth***, 899 A.2d 1085, 1098 (Pa. 2006); ***accord Harrisburg Sch. Dist. v. Hickok***, 761 A.2d 1132, 1136 (Pa. 2000) ("[A] classification is *per se* unconstitutional when the class consists of one member and it is impossible or highly unlikely that another can join the class."). In ***Pennsylvania Turnpike Commission***, the Supreme Court concluded that the statute at issue was *per se* unconstitutional in that "the class [defined by the statute] will never open to more than one member because the General Assembly defined 'public employer' as 'The Pennsylvania Turnpike Commission.'" ***Pa. Tpk. Comm'n***, 899 A.2d at 1098.

As our Supreme Court explained:

> Pennsylvania's proscription against local or special laws is currently found in Article III, Section 32, and was first adopted in the Pennsylvania Constitution of 1874. Like many constitutional provisions, it was adopted in response to immediate past abuses. The main purpose behind Article III, Section 32 was to put an end to the flood of privileged legislation for particular localities and for private purposes which was common in 1873. Over the years, the underlying purpose of Article III, Section 32 has been recognized to be analogous to federal principles of equal protection under the law and thus, special legislation claims and equal protection claims have been reviewed under the same jurisprudential rubric.

> The common constitutional principle at the heart of the special legislation proscription and the equal protection clause is that like persons in like circumstances should be treated similarly by the sovereign. Nonetheless, it is settled that equal protection principles do not vitiate the Legislature's power to classify, which necessarily flows from its general power to enact regulations for the health, safety, and welfare of the community, nor do these principles prohibit differential treatment of persons having different needs. . . .

The prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications, provided that those classifications are reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation. In other words, a classification must rest upon some ground of difference, which justifies the classification and has a fair and substantial relationship to the object of the legislation.

Thus, there are a legion of cases recognizing that a legislative classification which appears to be facially discriminatory may nevertheless be deemed lawful if the classification has a rational relationship to a legitimate state purpose. Furthermore, legislative classifications must be founded on real distinctions in the subjects classified and not on artificial or irrelevant ones used for the purpose of evading the constitutional prohibition. Finally, in analyzing a special legislation/equal protection challenge, a reviewing court is free to hypothesize reasons the General Assembly might have had for the classification of certain groups.

*Pa. Tpk. Comm'n*, 899 A.2d at 1094-95 (internal citation, quotation marks and footnotes omitted).

In *Hickok*, the statute at issue provided for a classification that applied only to "'a school district of the second class with a history of low test performance which is coterminous with the city of the third class which contains the permanent seat of government.'" *Hickok*, 761 A.2d at 1136. Rejecting appellant's argument (as lacking merit) that the classification could apply to another school district because the capital could be moved to another third class city in the future, the Supreme Court concluded that the classification could apply only to the Harrisburg School District. *Id.* Accordingly, the court held the statute to be *per se* unconstitutional. *Id.*

Here, unlike the statutes in *Pennsylvania Turnpike Commission* and *Hickok*, Section 1929.1 is not *per se* constitutionally infirm under Article III, Section 32, because it does not contain an *apparent* class consisting of

one member that is closed or substantially closed to future membership. Moreover, based on our review of the record, we conclude Appellant has not offered any relevant evidence suggesting that Section 1929.1 is limited to Appellee and that no other company could avail itself of the benefits of Section 1929.1.[7]  It bears repeating that Appellant carries a heavy burden of proof for purposes of challenging the constitutionality of Section 1929.1 under Article III, Section 32, which Appellant fails to meet *sub judice*.  **See Pa. Tpk. Comm'n**, 899 A.2d at 1098.  As the trial court aptly noted:

> As a threshold matter, [Appellant] has not established the [s]tatute was intended to benefit [Appellee] alone.  The [s]tatute's legislative history reflects its sponsors used [Appellee] as an example of the [s]tatute's purpose, all the while emphasizing the potential benefit to other similarly situated corporations throughout the Commonwealth.
>
> More importantly, [Appellant] has not shown it is impossible or highly unlikely for other corporations to enjoy the [s]tatute's protection.  It seems likely, or at least possible, a Pennsylvania (non-insurance) corporation besides [Appellee] acquired a predecessor with asbestos-related liabilities before May 1, 2001 and could eventually limit its liabilities under the [s]tatute.  [Appellant] offers *zero evidence* to refute this.  Accordingly, he has not shown [Appellee] is the only member of the protected class [under Section 1929.1].

Trial Court Opinion, 1/8/14, at 10 (emphasis added).  In support of its conclusion, the trial court quoted the following passage from Judge Tereshko's opinion in **Asbestos Litig.**:

---

[7] To support its argument, Appellant cites legislative history to suggest Section 1929.1 was enacted for the benefit of Appellee, because the legislation's sponsors invoked only Appellee by name.  **See** Appellant's Brief at 21.  As the trial court found, however, sponsors of the bill merely used Appellee as an example to put the legislation's purpose into proper perspective.  **See** Trial Court Opinion, 1/8/14, at 10.

> [G]iven the actual number of Pennsylvania Defendants who may qualify and the lack of contrary evidence, and the clearly expressed basis for the Legislation, that is, the limiting of liability of an asbestos Defendant under a successor liability theory to the acquired assets, the Legislation fails the test for a special law and passes the rational basis test.

*In re Asbestos Litig.*, 2002 WL 1305991, at *14.  Addressing the same issue that is before us, the trial court found that "there are 7,293 Pennsylvania corporations" who may be subject to the protections of Section 1929.1.  *Id.* at 13.  Neither Appellant nor Appellee challenges the trial court's reliance on *Asbestos Litig.*, which the Supreme Court reversed on other grounds.[8]  Given the fact that Section 1929.1, on its face, does not exclusively limit its protection to one entity (Appellee) *ad infinitum*, and Appellant otherwise has failed to offer any evidence that Section 1929.1 would apply only to Appellee, we conclude that the trial court did not err in holding Section 1929.1 was not a "special law" under Article III, Section 32.

Appellant's reliance on *West Mifflin* is misplaced.  Similar to *Pennsylvania Turnpike Commission* and *Hickok*, in *West Mifflin*, our Supreme Court concluded on *stipulated facts* that Act 45 of 2007, Act of July 20, 2007, P.L. 278, No. 45 (Act 45), was *per se* special legislation and thus unconstitutional.  *See West Mifflin*, 4 A.3d at 1048 (noting that "a highly

---

[8] Exercising extraordinary jurisdiction under 42 Pa.C.S.A. § 726, the Supreme Court reversed the trial court on the basis that Section 1929.1(a) was unconstitutional as applied under Article I, Section 11 of the Pennsylvania Constitution to the extent it extinguished causes of actions that accrued prior to the enactment of the statute.  *Ieropoli*, 842 A.2d at 930-32.

improbable convergence of events would be necessary for any school district . . . to be affected by the legislative provisions at issue."). As the Supreme Court recognized, only one school district met all of the criteria under the challenged legislative provisions of Act 45. *Id.* Additionally, only five other school districts could have been subject to the provisions of Act 45, and none of them operated under a special board of control. To enter the class, one of those districts would have to return to control-board governance for five consecutive years and eliminate their high schools without assigning their pupils to other school districts. *Id.* More important, no other school district could benefit from Act 45, because remedial action had to be taken within fifteen days of the act's effective date, *i.e.*, by August 14, 2007. *Id.* at 1048-49. Based on those facts, our Supreme Court concluded that "the class created by Section 1607.1 [of Act 45] is, at a minimum, 'substantially closed' to new members." *Id.* at 1049.

In the instant case, unlike **West Mifflin**, there is no stipulation, much less any reliable evidence, that Section 1929.1 applies only to one entity, *i.e.*, Appellee. Accordingly, as stated above, the trial court did not err in concluding that Section 1929.1 was constitutional under Article III, Section 32.

### B. Article III—Procedural Mandates

We next address Appellant's second and third arguments that the legislation, *i.e.*, Act 101, giving rise to Section 1929.1, ran afoul of the procedural mandates of Article III of the Pennsylvania Constitution.

To put Appellant's constitutional arguments under Sections 1 and 3 in context, we must provide a brief discussion of the legislative history of Act 101. The legislation originated in the Pennsylvania State Senate on January 31, 2001, with the introduction of Senate Bill 216 of 2001, P.N. 0223 ("S.B. 216, P.N. 223"). This single page bill contained two sections, one generally amending Section 5524 of the Judicial Code, 42 Pa.C.S.A. § 5524, relating to a two-year statute of limitations,[9] and the other providing for an effective date of 60 days after enactment. This bill was passed by the Senate Judiciary Committee on February 13, 2001. Subsequently, it was considered by the full Senate on three separate occasions, with final passage in the Senate occurring on March 14, 2001.

S.B. 216, P.N. 223 was thereafter sent to the House of Representatives, and, upon approval by the House Judiciary Committee without amendment, it was considered twice by the full House. Following the second consideration, S.B. 216, P.N. 223 was referred to the House Appropriations Committee, which re-reported it on November 19, 2001, without amendment, and re-referred it to the House Judiciary Committee.

---

[9] Specifically, the bill added subsection 8 to Section 5524, which provided:

> (8) An action to recover damages for injury to a person or for the death of a person caused by the *exposure to asbestos* shall be commenced within two years from the date the person was informed by a licensed physician that the person has an injury which is caused by such exposure.

Senate Bill 216, Printer's No. 223 (emphasis added).

On December 4, 2001, the House Judiciary Committee approved S.B. 216, P.N. 223 with amendments, affecting Sections 1725.1 (relating to costs) and 3571(c) (relating to costs in magisterial district judge proceedings) of the Judicial Code, 42 Pa.C.S.A. §§ 1725.1, 3571(c). In addition, the House Judiciary Committee amended S.B. 216, P.N. 223—specifically subsection 8 of Section 5524 of the Judicial Code. This amended legislation was redesignated S.B. 216, P.N. 1576. The full House passed this amended version of the bill on December 5, 2001, and sent it to the Senate for further deliberations.

In the Senate, the bill was referred to the Senate Rules Committee, which altered the legislation by amending the prefatory language of the bill, removing the amendments made in the House, adding Section 1929.1 (relating to limitations on asbestos-related successor liabilities), amending subsection 8 of 5524 of the Judicial Code,[10] and adding an amended Section

---

[10] The amended version of subsection 8 of Section 5524, which is now in effect, provides:

> An action to recover damages for injury to a person or for the death of a person caused by exposure to asbestos shall be commenced within two years from the date on which the person is informed by a licensed physician that the person has been injured by such exposure or upon the date on which the person knew or in the exercise of reasonable diligence should have known that the person had an injury which was caused by such exposure, whichever date occurs first.

42 Pa.C.S.A. § 5524(8).

8128 of the Judicial Code, 42 Pa.C.S.A. § 8128.[11] The Rules Committee reported the amended version of the bill to the full Senate as S.B. 216, P.N. 1617. The Senate, thereafter, approved the bill on December 11, 2001.

The Senate sent S.B. 216, P.N. 1617 to the House on December 12, 2001, and the house voted to approve it on that date. Subsequently, the bill was sent to then-Governor Mark Schweiker who signed it on December 17, 2001, at which time it became Act 101 of 2001.

### 1. Original Purpose

We now address Appellant's argument that S.B. 216, which eventually became Act 101, violated the strictures of Article III, Section 1 of the Pennsylvania Constitution[12] to the extent it departed from its original purpose "as it passed through the legislature." Appellant's Brief at 32. In this regard, Appellant contends that the original purpose of S.B. 216 was changed in the final iteration of the bill. At the core, Appellant argues the trial court erred in finding that "the original purpose always was 'regulation of asbestos-related liability.'" Appellant's Brief at 35. We disagree.

---

[11] Section 8128 was amended by the addition of subsection (c), which now is in effect and provides "[t]he provisions of this Section shall also apply to the limitations set forth in 15 Pa.C.S. § 1929.1 (relating to limitations on asbestos-related liabilities relating to certain mergers and consolidations)." Senate Bill 216, Printer's No. 1617; 42 Pa.C.S.A. § 8128(c).

[12] Article III, Section 1 provides "[n]o Law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose." PA. CONST. art. III, § 1.

To determine whether a bill has deviated from its original purpose, our Supreme Court has adopted a two-part test:

> First, the court will consider the original purpose of the legislation and compare it to the final purpose and determine whether there has been an alteration or amendment so as to change the original purpose. Second, a court will consider, whether in its final form, the title and contents of the bill are deceptive.

***Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth***, 877 A.2d 383, 408-09 (Pa. 2005) ("***PAGE***"). The challenged legislation must meet both parts of the test to pass constitutional muster. ***See id.*** at 409. Instantly, however, Appellant challenges Act 101 only on the basis of the first test, *i.e.*, purpose comparison. Explaining the first test, the Supreme Court remarked:

> Regarding the determination of the original purpose of the legislation, we recognize the realities of the legislative process which can involve significant changes to legislation in the hopes of consensus, and the expectation that legislation will be transformed during the enactment process. Furthermore, our Court is loathe to substitute our judgment for that of the legislative branch under the pretense of determining whether an unconstitutional change in purpose of a piece of legislation has occurred during the course of its enactment. For these reasons, we believe that the original purpose must be viewed in *reasonably broad terms*.
>
> . . . It is helpful for a reviewing court to hypothesize, based upon the text of the statute, as to a reasonably broad original purpose. Given this approach of considering a *reasonably broad original purpose*, the General Assembly is given full opportunity to amend and even expand a bill, and not run afoul of the constitutional prohibition on an alternation or amendment that changes its original purpose. The original purpose is then compared to the final purpose and a determination is made as to whether an unconstitutional alteration or amendment, on its passage through either house, has taken place so as to change its original purpose.

***Id.*** (internal citation and quotation marks omitted) (emphasis added).

With the foregoing principles in mind, like the court in **PAGE**, we consider the original purpose of Act 101 in reasonably broad terms, and compare it to its final purpose to assess whether the purpose has changed. Here, based upon our review of the legislative history, particularly the different versions of Act 101, we agree with the trial court's conclusion that "[t]he [legislation's] original purpose is more appropriately construed as the regulation of asbestos-related liability." Trial Court Opinion, 1/8/14, at 12. When Act 101, as S.B. 216, was introduced on January 31, 2001, its original purpose was to amend the Judicial Code by extending the two-year statute of limitations under Section 5524 to *asbestos* cases. Specifically, the bill's original purpose was to "[amend] Title 42 (Judiciary and Judicial Procedure) of the Pennsylvania Consolidated Statutes, further providing for *limitations of actions*." Senate Bill 216, Printer's No. 223 (emphasis added). That purpose, however, changed twice. The House first amended the bill's purpose to read "[a]mending Title 42 (Judiciary and Judicial Procedure) of the Pennsylvania Consolidated Statutes, further providing for _costs, for Commonwealth portion of fines and for_ limitations of actions." Senate Bill 216, Printer's No. 1576 (emphasis added to show amendments). Thereafter, when the bill containing the House amendments reached the Senate, that body, in turn, amended the purpose of S.B. 216 to read:

> Amending Title 15 (Corporations and Unincorporated Associations) and 42 (Judiciary and Judicial Procedure) of the Pennsylvania Consolidated Statutes, providing for *limitations on asbestos-related liabilities* relating to certain mergers or consolidations; and further providing for certain statutes of limitations and for certain transfers.

- 21 -

Senate Bill 216, Printer's No. 1617 (emphasis added). Thus, our review of the original and final versions of Act 101 confirms the trial court's holding that the legislation was constitutional under Article III, Section 1, because its broad original purpose "remained intact when the [legislation] was altered to limit successor liability and provide for certain judicial costs." Trial Court Opinion, 1/8/14, at 12. Limiting successor liability and providing for judicial costs both come under the umbrella of regulating asbestos-related liability. Accordingly, Appellant fails to satisfy the first prong of the *PAGE* test and we will not substitute our judgment for that of the General Assembly.

### *2. Single Subject*

We next address Appellant's argument that Act 101 runs afoul of Article III, Section 3 of the Pennsylvania Constitution.[13] Specifically, Appellant argues that Act 101 violates the single subject rule of Article III, Section 3, because it contains "distinct subjects" that lack a "unifying scheme." Appellant's Brief at 24, 29. Differently put, Appellant claims that the varying subjects within Act 101 were not germane to each other. Additionally, Appellant claims

> [t]he Crown Cork language [(Section 1929.1)] was attached to an unrelated bill [(S.B. 216)] that was further along in the

---

[13] Article III, Section 3, relating to form of bills, provides:

> No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

PA. CONST. art. III, § 3.

legislative process with little opposition to its passage, and the final version rushed through the legislature before the December holiday recess before any objection to [the] language could be made by affected parties.

*Id.* at 29. We, disagree.

As our Supreme Court recently remarked:

the single subject rule of Article III, Section 3 was first included by the framers of our Commonwealth's organic charter in 1864, and then readopted as part of the 1874 Constitution, in order to effectuate the electorate's overall goal of curtailing legislative practices that it viewed with suspicion. In particular, there were two legislative practices the framers and the electorate sought to eliminate with their adoption of Article III, Section 3. The first involved the insertion into a single bill of a number of distinct and independent subjects of legislation in order to deliberately hide the real purpose of the bill. The second was the practice of logrolling which involves embracing in one bill several distinct matters, none of which could singly obtain the assent of the legislature, and procuring its passage by combining the minorities who favored the individual matters to form a majority that would adopt them all.

Our Court has additionally observed that Article III, Section 3 serves other salutary purposes furthering the efficiency of the legislative process. The requirement that each piece of legislation pertain to only one subject creates a greater likelihood that it will receive a more considered and thorough review by legislators than if it is aggregated with other pieces of legislation pertaining to different topics into a singular omnibus bill, thereby creating a jumbling together of incongruous subjects.

Additionally, and significantly, the single subject requirement proscribes the inclusion of provisions into legislation without allowing for fair notice to the public and to legislators of the existence of the same. It, thus, provides a vital assurance to residents of this Commonwealth that they will be able to make their views and wishes regarding a particular piece of legislation known to their duly elected representatives *before* its final passage, and it concomitantly ensures that those representatives will be adequately apprised of the full scope and impact of a legislative measure before being required to cast a vote on it.

**Commonwealth v. Neiman**, 84 A.3d 603, 611-12 (Pa. 2013) (internal citation and quotation marks omitted) (emphasis in original).

It is settled that to determine whether a bill is violative of Article III, Section 3, a court must employ a two-prong test. "First, the title of the bill must clearly express the substance of the proposed law. . . . Second, the differing topics within the bill must be 'germane' to each other." *Jury Comm'rs*, 64 A.3d at 616. Instantly, Appellant challenges Act 101 only under the second prong, *i.e.*, the various topics were not germane to each other.[14]

> In determining germaneness, our [Supreme Court] has acknowledged that some degree of deference to the General Assembly's prerogative to amend legislation is required, due to the normal fluidity inherent in the legislative process, and, thus, [the Court has] deemed it is appropriate for a reviewing court to hypothesize a reasonably broad topic which would unify the various provisions of a final bill as enacted. However, [the] Court has also stressed the reasonable aspect of any proposed hypothetical unifying topic, in recognition of the fact that Article III, Section 3 would be rendered nugatory if such hypothetical

---

[14] As Appellee aptly notes, and we agree, to the extent Appellant claims under the first prong that fair notice regarding Act 101 was not provided to the public or interested stakeholders, such claim must be rejected as lacking merit because Appellant provides no evidence in support of the claim. As our Supreme Court explained in *PAGE*, "'[o]ne who seeks to declare a title unconstitutional under [Section III] must demonstrate either (1) that the legislators and the public were actually deceived as to the act's contents at the time of passage, or (2) *that the title on its face is such that no reasonable person would have been on notice as to the act's contents*.'" *PAGE*, 877 A.2d at 406 (emphasis added). As noted earlier, a legislative enactment enjoys a strong presumption of constitutionality and it will not be declared invalid unless it clearly, palpably, and plainly violates the Constitution. *See PAGE*, 877 A.2d at 393. The party seeking to overcome this presumption bears a *heavy burden* of persuasion and we will resolve all doubts in favor of a finding of constitutionality. *See Commonwealth v. Hendrickson*, 724 A.2d 315, 317 (Pa. 1999). Moreover, to the extent Appellant argues, without providing any legal support, that the time in which Act 101 was enacted was *per se* insufficient to provide fair notice to the public, we also reject such argument as without merit.

- 24 -

> topics were too expansive. [The Court] observed that, no two subjects are so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough. Consequently, in determining whether a proposed unifying subject is sufficiently narrow so as to pass muster under Article III, Section 3, [courts] must examine the various subjects contained within a legislative enactment and determine whether they have a nexus to a *common purpose*. Stated another way, [their] task is to ascertain whether the various components of the enactment are part of a unifying scheme to accomplish a single purpose.

*Neiman*, 84 A.3d at 612 (internal citation and quotation marks omitted) (emphasis added). The requirements of Article III, Section 3 are fulfilled "where the provisions added during the legislative process assist in carrying out a bill's main objective or are otherwise 'germane' to the bill's subject as reflected in its title." *City of Philadelphia v. Commonwealth*, 838 A.2d 566, 587 (Pa. 2003).

In *PAGE*, the court concluded that the challenged legislation (Gaming Act) survived Section 3 scrutiny inasmuch as the law provided for the regulation of gaming. *PAGE*, 877 A.2d at 396. The court distinguished *PAGE* from *City of Philadelphia*, in which it previously held that Act 230 of 2002 was repugnant to the single subject rule, because the main objective of the act was to amend Title 53 (Municipalities) and "virtually all of local government is a municipality." *Id.* In so distinguishing, the court noted "[t]he single topic of gaming does not encompass the limitless number of subjects which could be encompassed under the heading of municipalities." *Id.*

Here, based on the record and legislative history, we conclude that Act 101 comports with the constitutional requirements of Article III, Section 3.

- 25 -

The Act *sub judice* is similar to the Gaming Act in **PAGE** in that its single, unifying purpose is the regulation of asbestos-related liability. All sections of Act 101 are connected to this particular purpose. We, therefore, conclude that the trial court did not err in holding Act 101 constitutional under Article III, Section 3 on the basis that all provisions of Act 101 "deal with sub-topics germane to regulating asbestos-related liability."[15] Trial Court Opinion, 1/8/14, at 12.

We also find that Appellant's reliance upon **Neiman** to argue that Act 101 is unconstitutional under Section 3 is misplaced. **Neiman** is markedly distinguishable from the instant case. The Supreme Court in **Neiman** entertained a challenge (under Article III, Section 3) to Act 152 of 2004, which made various amendments to the Judicial Code.[16] As in **City of**

_____

[15] To the extent Appellant argues that Section 3 of Act 101, *i.e.*, 42 Pa.C.S.A. § 8128(c), does not relate to the regulation of asbestos-related liability, we disagree. Section 3 extends protections of Section 8128 of the Judicial Code to companies that qualify under Section 1929.1. Differently put, the addition of subsection (c) to Section 8128 of the Judicial Code limits creditors' ability to recover damages from companies that qualify under Section 1929.1 in a forum that affords fewer protections to such companies than Pennsylvania.

[16] As our Supreme Court noted, S.B. 92, P.N. 1995, which eventually became Act 152,

> accomplished the following substantive legal changes: (1) established a two-year limitation for asbestos actions; (2) amended the Crimes Code to create various criminal offenses for individuals subject to sexual offender registration requirements who fail to comply; (3) amended the provisions of the Sentencing Code which govern "Registration of Sexual Offenders"; (4) added the offenses of luring and institutional sexual assault to the list of enumerated offenses which require a

*(Footnote Continued Next Page)*

*Philadelphia*, the court observed that the unifying subjects of Act 152 were too broad to meet the requirements of Article III, Section 3, because "such subjects are virtually boundless in that they could encompass, respectively, *any* civil court proceeding which could be brought in the courts of this Commonwealth, and *any* power of the judiciary to impose sanctions on, or order the payment of damages by, a party to civil litigation." *Neiman*, 84 A.3d at 613 (emphasis in original). Declaring Act 152 violative of the single subject provision of Section 3, the court noted that it could not discern a "common nexus" between the different provisions of the act. *Id.* Specifically, the court noted "we can see no reasonable basis under which

*(Footnote Continued)* ——————

> 10–year period of registration and established local police notification procedures for out-of state sexual offenders who move to Pennsylvania; (5) directed the creation of a searchable computerized database of all registered sexual offenders ("database"); (6) amended the duties of the Sexual Offenders Assessment Board ("SOAB"); (7) allowed a sentencing court to exempt a lifetime sex offender registrant, or a sexually violent predator registrant, from inclusion in the database after 20 years if certain conditions are met; (8) established mandatory registration and community notification procedures for sexually violent predators; (9) established community notification requirements for a "common interest community"—such as a condominium or cooperative—of the presence of a registered sexually violent predator; (10) conferred immunity on unit owners associations of a common interest community for good faith distribution of information obtained from the database; (11) directed the Pennsylvania State Police to publish a list of approved registration sites to collect and transmit fingerprints and photographs of all sex offenders who register at those sites; and (12) mandated the Pennsylvania Attorney General to conduct annual performance audits of state or local agencies who participate in the administration of Megan's Law, and, also, required registered sex offenders to submit to fingerprinting and being photographed when registering at approved registration sites.

*Neiman*, 84 A.3d at 606-07 (footnotes omitted).

deficiency judgment procedures, asbestos statutes of limitations, county police jurisdiction, and sexual offender registration requirements act together as 'a unifying scheme to accomplish a single purpose.'" ***Id.*** As explained above, Act 101 *sub judice*, unlike Act 152 in ***Neiman***, contains provisions that are germane to each other because they embody the single unifying purpose of regulating asbestos-related liability.

Accordingly, the trial court did not err in rejecting Appellant's constitutional challenges against Act 101 under Sections 1 and 3 of Article III.

### C. Equal Protection

Appellant argues Section 1929.1 fails to withstand constitutional scrutiny under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV, § 1, as well as Article III, Section 32 of the Pennsylvania Constitution. To support its argument, Appellant points out that similarly situated out-of-state corporations and Pennsylvania corporations that do not meet the classifications of Section 1929.1 are subject to disparate treatment, because their asbestos-related liability is not capped. Appellant's Brief at 39. More important, Appellant argues that Section 1929.1 facially discriminates against out-of-state corporations. ***Id.*** at 40.

To begin, as we noted above, our Supreme Court treats equal protection claims under the Fourteenth Amendment to the United States Constitution the same as equal protection claims brought under Article III,

Section 32 of the Pennsylvania Constitution. *See Probst v. Dep't of Transp., Bureau of Driver Licensing*, 849 A.2d 1135, 1143 (Pa. 2004); *see also Harrisburg Sch. Dist. v. Zogby*, 828 A.2d 1079, 1088 (Pa. 2003) (noting that "the meaning and purpose of the Equal Protection Clause of the United States Constitution . . . and [Pennsylvania's] Constitution's prohibition against special laws . . . are sufficiently similar to warrant like treatment, and that contentions concerning the two provisions may be reviewed simultaneously"). "The essence of the constitutional principle of equal protection under the law is that like persons in like circumstances will be treated similarly." *Curtis v. Kline*, 666 A.2d 265, 267 (Pa. 1995) (citation omitted). However, "[t]he prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications, provided that those classifications are reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation." *Id.* at 268 (citations omitted).

Describing the equal protection analytical framework, our Supreme Court recognized

> three different types of classifications calling for three different standards of judicial review. The first type—classifications implicating neither suspect classes nor fundamental rights—will be sustained if it meets a "rational basis" test. . . . In the second type of cases, where a suspect classification has been made or a fundamental right has been burdened, another standard of review is applied: that of strict scrutiny. . . . Finally, in the third type of cases, if "important," though not fundamental rights are affected by the classification, or if "sensitive" classifications have been made, the United States Supreme Court has employed what may be called an intermediate standard of review, or a heightened standard of review. . . .

*Commonwealth v. Parker White Metal Co.,* 515 A.2d 1358, 1363 (Pa. 1986) (quoting *James v. Se. Pa. Transp. Auth. (SEPTA)*, 477 A.2d 1302, 1306 (1984)).

Here, as Appellee correctly observes, Appellant does not claim that Section 1929.1 affects a fundamental right or a suspect class. Appellee's Brief at 25. Instead, Appellant claims, *inter alia*, Section 1929.1's disparate treatment of Appellee compared to similarly situated out-of-state concerns and certain in-state companies that do not meet Section 1929.1's classifications is not reasonable, but arbitrary.[17] *See* Appellant's Brief at 41. Because this argument does not implicate a fundamental right or suspect class, we proceed to analyze Appellant's equal protection claim under the rational basis standard.

> This Court has observed:
>
> Rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. Nor does it authorize the judiciary to sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines. For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.

---

[17] Specifically, Appellant argues "[t]here is no reasonable explanation why all other successor corporations were excluded. It is obvious that the criteria were chosen because the drafters intended that only [Appellee] benefit from the legislation." Appellant's Brief at 41.

*In re Keyes*, 83 A.3d 1016, 1027 (Pa. Super. 2013) (quotation marks and citation omitted), *appeal denied*, 2014 WL 4799569 *1 (Pa. filed Sep. 24, 2014).

It is settled that in applying the rational basis test, we apply a two-step analysis: 1) whether the challenged statute seeks to promote any legitimate state interest or public value and, if so, 2) whether the classification adopted in the legislation is reasonably related to accomplishing an articulated state interest or interests. *Curtis*, 666 A.2d at 269. As we have repeatedly stated herein, Appellant bears a *heavy burden* of proof for purposes of challenging the constitutionality of a statute, *see Pa. Tpk. Comm'n*, 899 A.2d at 1098, especially where, as here, the challenged legislation concerns only economic issues to be examined under a rational basis standard. *See also Hodel v. Indiana*, 452 U.S. 314, 332 (1981) ("[S]ocial and economic legislation is valid unless 'the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational.' This is a heavy burden . . . ."). We resolve all doubts in favor of a finding of constitutionality. *See Commonwealth v. Hendrickson*, 724 A.2d 315, 317 (Pa. 1999).

With respect to the first step of the rational basis test, we must determine whether the Commonwealth had any legitimate interest in enacting Section 1929.1. Our review of the record and legislative history

indicates that the General Assembly indeed provided a purpose or rationale underlying the enactment of Section 1929.1.[18]  As the trial court noted:

> [Section 1929.1's] purpose was explained in detail by its sponsors, Senators Michael J. Stack, III, Robert M. Tomlinson, and Michael L. Waugh, before the General Assembly in 2001. Pa. Legis. Journal—Senate (December 11, 2001), 1230-33. [Section 1929.1] was meant to advance the Commonwealth's "basic governmental interest to make sure our corporate merger laws do not unfairly expose innocent companies to ruin solely because of a merger." *Id.* at 1231-32.  [Section 1929.1] combats the "unprecedented avalanche of asbestos-related claims" threatening to destroy corporations like [Appellee], which are exposed to liability based solely on their predecessors' actions.  *Id.* at 1230-32.  [Section 1929.1] protects such corporations, which provide jobs to Pennsylvania residents and are integral to the Commonwealth's economy.  *Id.* at 1230-33. [Section 1929.1] only affects plaintiffs' tort recoveries to the extent necessary to protect corporations exposed to excessive successor liabilities, noting the asbestos plaintiffs would still be adequately compensated by the plethora of other defendants. *Id.* at 1232.

Trial Court Opinion, 1/8/14, at 7-8.  Accordingly, we find that Section 1929.1 in fact promotes a legitimate state purpose by providing protection to corporations—that provide jobs to state residents, which is integral to our economy—exposed to excessive successor liabilities.

Turning now to the second step under the rational basis test, we address Appellant's assertion that Section 1929.1's classification is arbitrary and not reasonable, because it is intended for the *sole* benefit of Appellee, as opposed to advancing a state interest.  Appellant's Brief at 41.  Our

---

[18] Even if the General Assembly had not articulated a purpose or rationale for Section 1929.1, "it is enough that some rationale may conceivably . . . have been the purpose and policy of the relevant government decisionmaker." **Small v. Horn**, 722 A.2d 664, 672 (Pa. 1998) (citation and quotation marks omitted).

review of Section 1929.1 and its legislative history does not reveal any basis for us to conclude that Section 1929.1's classification of domestic business corporations is not reasonably related to the state interest sought to be advanced. As stated, the Commonwealth has a legitimate interest to ensure corporate merger laws do not unfairly expose domestic business corporations to ruin solely because of mergers. To this end, Section 1929.1 protects domestic corporations that provide jobs to Pennsylvania residents by not exposing the corporations to excessive successor liability.[19] The classification of domestic business corporations that employ Pennsylvania residents is rationally related to the purpose to be achieved under the protection afforded by Section 1929.1. This basis alone is sufficient justification to find the legislative classification under Section 1929.1 is not arbitrary or unreasonable. As for Appellant's argument that Section 1929.1 is unreasonable because it benefits only Appellee, it bears repeating, as the trial court aptly noted, that more than 7,000 Pennsylvania corporations may benefit from Section 1929.1. More important, the mere fact that the legislative classification under Section 1929.1 only partially ameliorates a

---

[19] Even in the absence of legislative history, a classification, though discriminatory, is not arbitrary or in violation of equal protection if any state of facts reasonably can be conceived to sustain the classification. *See Curtis*, 666 A.2d at 268; *accord Heller v. Doe by Doe*, 509 U.S. 312, 319–320 (1993). In undertaking this analysis, a reviewing court also is free to hypothesize reasons the legislature might have had for the classification. *Curtis*, 666 A.2d at 268.

perceived evil does not render the classification in violation of equal protection. The General Assembly may take an incremental approach to addressing problems that are of statewide concern. *See Pa. Tpk. Comm'n*, 899 A.2d at 1097. This is so even if the class consists of only one member, so long as other members might come into the class. *Id.* States are accorded wide latitude in the regulation of their local economies, and rational distinctions may be made with less than mathematical exactitude. *See Martin v. UCBR*, 466 A.2d 107, 112 (Pa. 1983). It is only invidious discrimination, or the wholly arbitrary act, which cannot withstand scrutiny under an equal protection analysis. *Id.* We find no such discrimination present in the instant case.

We also find Appellant's reliance upon *WHYY, Inc. v. Borough of Glassboro*, 393 U.S. 117 (1968), to be misplaced. In *WHYY* a Pennsylvania nonprofit corporation operated a noncommercial television station in New Jersey and had registered and qualified to do business in that state. A New Jersey statute exempted nonprofit corporations from its real and personal property taxes, but this exemption applied only to New Jersey nonprofit corporations. The United States Supreme Court noted that it has consistently held:

> [W]hile a State may impose conditions on the entry of foreign corporations to do business in the State, once it has permitted them to enter, the adopted corporations are entitled to equal protection with the state's own corporate progency [sic], at least to the extent that their property is entitled to an equally favorable ad valorem tax basis.

*Id.* at 119 (citations omitted). In finding the statute denied WHYY, Inc. equal protection of the law, the Court held New Jersey had not advanced any distinction between the appellant and a domestic nonprofit corporation to justify the unequal treatment. In so holding, the Court rejected the argument that the legislative purpose could reasonably have been to avoid the administrative burden on the taxing authority to examine the laws of other jurisdictions to determine if a corporation's nonprofit status satisfied New Jersey's requirements. *See id.* at 120. None of the parties suggested there was any greater administrative burden in evaluating a foreign than a domestic corporation under New Jersey law. *See id.* Therefore, the inequality of treatment arose solely because of "the different residence of the owner," rather than upon any "difference in (New Jersey's) relation to a decisive transaction." *Id.* (citation omitted).

The result in **WHYY** is in accord with Pennsylvania's decisional law, which requires that a legislative classification be reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation. **See Curtis**, **supra**. It became evident in **WHYY** that the legislative classification drawn by New Jersey (domestic nonprofits versus foreign New Jersey registered nonprofits) had no reasonable relationship to any legislative objective sought to be achieved under the taxing statute. Thus, equal protection was violated because the legislative classification was wholly arbitrary.

The instant matter is distinguishable from **WHYY**, because, as already stated, Section 1929.1's legislative classification of domestic business corporations has a very real and reasonable relationship to Pennsylvania's legislative objective to protect domestic business corporations, which employ Pennsylvania residents and are integral to its economy, from financial ruin because of mergers.[20]

Accordingly, we conclude the trial court did not err in determining that Section 1929.1 did not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution or? Article III, Section 32 of the Pennsylvania Constitution.

### III. CONCLUSION

For the foregoing reasons, we conclude that the trial court did not err as a matter of law in granting Appellee's motion for summary judgment.[21]

---

[20] Citing **Moyer v. Phillips**, 341 A.2d 441 (Pa. 1975), only for the general proposition that legislative classifications must have a fair and reasonable relation to the object of the legislation, Appellant, alternatively, attempts to construct an equal protection argument that Section 1929.1 discriminates against classes of plaintiffs: those who cannot recover from Appellee and those who can recover from other successor corporations. We reject this attempt to redefine the legislative classification drawn by our General Assembly under Section 1929.1. The statute expressly establishes the class of domestic business corporations as opposed to foreign business corporations.

[21] Based on the outcome in this case, we need not address Appellant's remaining argument, *i.e.*, whether the trial court *sub silentio* determined there was a genuine issue of material fact as to Appellant's exposure to asbestos products.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/22/2014</u>